# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 4, 2016

## IN RE JOSE L., ET AL.

**Appeal from the Juvenile Court for Rhea County**
**No. 14-JV-17      J. Shannon Garrison, Judge**

_____

**No. E2016-00517-COA-R3-PT-FILED-OCTOBER 31, 2016**

_____

This is a termination of parental rights case. The trial court terminated Father's parental rights on the grounds of substantial noncompliance with a permanency plan and abandonment by willful failure to visit. The trial court also found that termination of Father's parental rights was in the best interest of the children. Having reviewed the record as it relates to the grounds for termination and the best interests of the children, we conclude that the trial court's findings are supported by clear and convincing evidence. We, therefore, affirm the judgment of the trial court terminating Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Larry G. Roddy, Dayton, Tennessee, for the appellant, Jose C.L.R.

Herbert H. Slatery III, Attorney General and Reporter; and W. Derek Green, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### BACKGROUND AND PROCEDURAL HISTORY

Jacqueline B. ("Mother") is the biological mother of the three children at issue in this appeal–J.L., A.L., and M.L.–and their half-siblings–A.R. and C.B.[1] Jose C.L.R. ("Father") is

---

[1] It is the policy of this Court in parental termination cases to redact the names of certain individuals in order to protect the privacy of the children. In furtherance of that policy, we identify individuals related to the children using their given name and the first letter of their surname. We identify the children using their initials.

the biological father of J.L., A.L., and M.L. This appeal concerns only the termination of Father's parental rights to those three children.

Father is a Mexican citizen who has been living in the United States without legal status for approximately 15 years. He primarily speaks Spanish, and his ability to speak and understand English is limited. Mother and Father were never married but were involved in a romantic relationship from approximately 2004 to 2012. During the relationship, Mother lived in Tennessee while Father spent large portions of each year working in Florida. When he was not in Florida, Father primarily stayed with Mother and her two children from other relationships: A.R. and C.B. Eventually, Mother and Father had three children together: J.L. (born April 2008), A.L. (born October 2009), and M.L. (born April 2011).

The Tennessee Department of Children's Services ("DCS") first became involved with the family in 2011 when it received a referral alleging that Mother was abusing A.R. A subsequent DCS investigation revealed that A.R. was severely malnourished and had been physically abused. In the proceedings that followed, Father acknowledged that he lived with Mother and the children when he was not in Florida but denied that he had known about the abuse. In 2012, Mother's parental rights to A.R. were terminated. A.R. was placed in foster care and eventually adopted by her foster parents. Father ended his relationship with Mother around that time after learning that she had become romantically involved with another man, Daniel P.

In December 2013, DCS investigated allegations that the children remaining in Mother's care were being abused. Mother denied the allegations, and DCS did not find any evidence of abuse. DCS did, however, instruct Mother to take the children to a doctor. Mother took several of the children to a doctor but did not take A.L. When questioned, Mother provided various excuses for why she had been unable to take A.L. to the doctor. In February 2014, Daniel P. went to a local DCS office and reported that Mother was starving A.L. to the point that his life was in danger. Thereafter, DCS workers visited Mother's home several times looking for A.L., but he was not there. On February 24, Mother told DCS that Father had taken A.L. with him to Florida. DCS workers attempted to contact Father in Florida but were unsuccessful. Finally, on March 13, DCS received information that a school truancy officer had visited Mother's home and found all of the children, including A.L., there unsupervised.

The children were taken to a DCS office for interviewing. When they arrived, A.L. was so weak that he could not walk. He was dehydrated, severely malnourished, and had bruises and scratches all over his body. A.L. and the other children were taken to a hospital for examination while DCS workers interviewed Mother and Daniel P. During her interview, Mother told DCS workers that A.L. had been in Florida with Father for several months and had only returned to Tennessee the night before. Initially, Daniel P. corroborated Mother's story and denied the truthfulness of his previous report that Mother was abusing A.L. Later,

however, he admitted that he was lying and claimed that he did so because Mother threatened to have her brother kill him. He reaffirmed that Mother withheld food and water from A.L. and reported that she also beat A.L. and tied him to a bed post at night.

On March 13, 2014, C.B., J.L., A.L., and M.L. were removed from Mother's care and placed in foster care. C.B. and J.L. were placed together in the foster home of Naomi M. A.L. and M.L. were placed together in the foster home of Veronica R., who had previously adopted A.R. after serving as her foster mother. In July 2014, the juvenile court adjudicated the children dependent and neglected and found Mother guilty of severe child abuse. The court found that Father's inaction despite noticing changes in A.L.'s weight and personality contributed to his children's dependency and neglect but did not find him guilty of severe child abuse. Following a hearing in August 2015, the court terminated Mother's parental rights to the children.[2]

DCS Family Services Worker Stephanie Raulston, who worked previously with the family when A.R. was removed from Mother's care, was assigned to the case in March 2014. In April 2014, Ms. Raulston met with Father to develop a permanency plan aimed at placing J.L., A.L., and M.L. in his care. Among other things, the plan required Father to attend visits with the children, obtain appropriate housing and verifiable legal income, complete a psychological evaluation and a parenting assessment, and submit plans for transportation and childcare. Ms. Raulston met with Father to develop new permanency plans in October 2014 and March 2015. In addition to including the previous requirements, the new permanency plans required Father to complete a parenting class and submit proof of completion to DCS, complete nutrition classes and submit a weekly meal plan, submit a discipline plan, attend domestic violence counseling, and demonstrate an ability to communicate with the children in English and teach them Spanish. The juvenile court ratified each of the permanency plans. A DCS interpreter thoroughly explained the criteria and procedures for termination of parental rights and each of the permanency requirements Father in Spanish, and DCS provided Spanish copies of each of the documents to Father. Father has never denied understanding his requirements under the permanency plans or that his failure to complete them could result in termination of his parental rights.

Father returned from Florida after the children were removed from Mother's care, and he has lived in Tennessee since. After staying with friends for several months, Father moved to an apartment in Rhea County and provided Ms. Raulston with a copy of his lease in August 2014. Ms. Raulston visited the apartment shortly thereafter and observed that it was unfurnished and did not have electricity. She attempted to visit the apartment on one other occasion, but Father was not home. Ms. Raulston arranged for Father to have supervised visitation with all of the children for two hours every two weeks and offered to provide

---

[2] The juvenile court also terminated the parental rights of C.B.'s biological father, Miguel G., who did not participate in the proceedings.

transportation for him. Father attended approximately ten visits, and Ms. Raulston provided him with transportation on three or four occasions. During the visits, Father greeted and hugged the children, but the children generally played with each other while Father watched and took pictures of them. Father also attempted to exercise phone visitation with the children from time to time, but it proved to be difficult due to the children's limited understanding of Spanish. By August 2015, however, Father had not completed many of the other permanency plan requirements. Although he attended several parenting classes, he did not submit proof of his attendance to Ms. Raulston. The only proof of income he submitted to Ms. Raulston was a single pay stub reflecting payment of $144.50 for three days of work in July and August 2014. The pay stub did not contain any employer information, and Father was not able to provide Ms. Raulston with any information that would enable her to contact the employer. Father also failed to complete a psychological evaluation, parenting assessment, nutrition class, or domestic violence class, to submit transportation, childcare, discipline, or meal plans, or to demonstrate an ability to communicate with the children in English or teach them Spanish.

On August 28, 2015, DCS filed a petition to terminate Father's parental rights to J.L., A.L., and M.L. in the Rhea County Juvenile Court. In the petition, DCS asserted that terminating Father's parental rights was warranted on grounds of substantial noncompliance with a permanency plan and abandonment by willful failure to visit. It also asserted that terminating Father's parental rights would be in the children's best interests.

The juvenile court conducted a bench trial on the termination petition in January 2016. Father was present at the trial and represented by a court-appointed attorney. The court heard testimony from the DCS interpreter who had worked with Father throughout the case, from a DCS worker who was involved in the children's initial removal from Mother's care, from A.L. and M.L.'s foster mother–Veronica R., from J.L.'s foster mother–Naomi M., from Ms. Raulston, and from Father. At the close of proof, the trial court announced its finding that DCS established substantial noncompliance with a permanency plan and abandonment by willful failure to visit by clear and convincing evidence. It also found, by clear and convincing evidence, that terminating Father's parental rights would be in the children's best interests. On February 22, 2016, the trial court entered a written order reflecting its findings and terminating Father's parental rights to J.L., A.L., and M.L. Thereafter, Father timely filed a notice of appeal to this Court.

### ISSUES

Father raises the following issues on appeal, restated from his appellate brief:

1. Whether the trial court erred in finding that DCS proved the existence of grounds for terminating Father's parental rights by clear and convincing evidence.

2. Whether the trial court erred in finding that DCS proved that termination of Father's parental rights would be in the children's best interest by clear and convincing evidence.

**STANDARD OF REVIEW**

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993)); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although a parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate parental rights are governed by statute. A party seeking to terminate parental rights must prove two things. First, the party must prove the existence of at least one of the statutory grounds for termination.[3] Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010). Second, the party must prove that terminating parental rights is in the child's best interests.[4] Tenn. Code Ann. § 36-1-113(c)(2); *In re Angela E.*, 303 S.W.3d at 251. In light of the fundamental rights at stake in a termination proceeding, the grounds for termination and best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d at 653. It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Jaylah W.*, 486 S.W.3d 537, 545 (Tenn. Ct. App. 2015). This heightened standard of proof minimizes the risk of erroneous decisions. *In re M.J.B.*, 140 S.W.3d at 653.

---

[3] The statutory grounds for terminating parental rights are listed in Tennessee Code Annotated section 36-1-113(g). The petitioner needs only to establish the existence of one of the twelve statutory grounds to support an order terminating parental rights when termination is in the best interests of the child. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

[4] The factors to be considered in a "best interests" analysis are listed in Tennessee Code Annotated section 36-1-113(i).

In light of the heightened burden of proof in parental termination cases, a reviewing court must modify the customary standard of review set forth in Tennessee Rule of Appellate Procedure 13(d). First, we review the trial court's specific factual findings de novo with a presumption of correctness unless the evidence in the record preponderates otherwise. Tenn. R. App. P. 13(d); *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013). Second, we must determine whether the facts, as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence that the elements necessary to terminate parental rights have been established. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Bernard T.*, 319 S.W.3d at 596-97. Whether the facts are sufficient to support termination of parental rights is a conclusion of law, which we review de novo with no presumption of correctness. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (citing *In re Valentine*, 79 S.W.3d at 548).

In part, the trial court's ruling in this case was based on its assessment of the credibility of witness testimony presented at trial. Unlike appellate courts, trial courts are able to observe the manner and demeanor of witnesses as they testify. *In re M.A.R.*, 183 S.W.3d 652, 661 (Tenn. Ct. App. 2005) (citing *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)). When the resolution of an issue depends on credibility and the weight given to witness testimony, the trial court is in a far better position than this Court to resolve it. *In re Jacobe M.J.*, 434 S.W.3d 565, 569 (Tenn. Ct. App. 2013). We will therefore refrain from re-evaluating the trial court's assessment of witness credibility absent clear and convincing evidence to the contrary. *In re M.A.R.*, 183 S.W.3d at 661 (citing *Wells*, 9 S.W.3d at 783).

### GROUNDS FOR TERMINATION

Clear and convincing evidence of any one of the twelve statutory grounds for termination of parental rights listed in Tennessee Code Annotated section 36-1-113(g) is sufficient to support an order terminating parental rights where termination is in the best interests of the child. *In re Audrey S.*, 182 S.W.3d at 862. Nevertheless, this Court must consider the trial court's findings with regard to each of the grounds that it relied on in reaching its decision and with regard to its best interest inquiry regardless of whether the parent challenges those findings on appeal. *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016). With those principles in mind, we begin by reviewing the trial court's findings with regard to each of the statutory grounds for termination that it relied on in this case.

### *Substantial Noncompliance with a Permanency Plan*

The first statutory ground that the trial court relied on in terminating Father's parental rights is substantial noncompliance with a permanency plan. In Tennessee, an individual's parental rights may be terminated when he or she is in substantial noncompliance with the

statement of responsibilities contained in a permanency plan, Tenn. Code Ann. § 36-1-113(g)(2), so long as the plan's requirements are "reasonable and related to remedying the conditions which necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C). As we have emphasized in the past, noncompliance alone is not sufficient to warrant extinguishing the parent-child relationship. *See, e.g.*, *In re M.J.B.*, 140 S.W.3d at 656 ("Terminating parental rights . . . requires more proof than that a parent has not complied with every jot and tittle of the permanency plan."). To warrant termination, the parent's noncompliance must be "substantial." *In re Valentine*, 79 S.W.3d at 548. Substantial noncompliance is measured by both the degree of noncompliance and the weight assigned to the particular requirement. *Id.* "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656-57.

In its written order, the trial court explained its reasoning for finding that Father was in substantial noncompliance with the permanency plans:

> Today, DCS presented clear, cogent and convincing proof that [Father] failed to substantially comply with the tasks on his Permanency Plan. [Father] acknowledged receiving a copy in Spanish. By the time of the third Permanency Plan [Exh. 11], by his own testimony, [Father] still had not completed domestic violence counseling, presented a transportation or supervision plan and had not verified employment. [Father] is an illegal alien and his inability to speak English could have hampered his completion, but he did not avail himself of the services offered to assist. He is able to work and asserts that he has, but has no reason for not providing verification to DCS. The Court finds ground for termination of his parental rights pursuant to T.C.A. §§ 36-1-113(g)(2)[.]

On appeal, Father acknowledges that he substantially failed to comply with the statement of responsibilities contained in his permanency plans. Nevertheless, he argues that the trial court erred in relying on his substantial noncompliance as a ground for termination because DCS failed to prove that it made reasonable efforts to reunite the family. In support of this argument, Father cites past cases in which this Court has held that, in the absence of aggravating circumstances, DCS must establish by clear and convincing evidence that it made reasonable efforts to reunite the family and that its efforts were unsuccessful. *See In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006); *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 n.27 (Tenn. Ct. App. 2004). We note, however, that the Tennessee Supreme Court has expressly overruled those cases to the extent that they require DCS to prove reasonable efforts as an essential component of the termination petition. *In re Kaliyah S.*, 455 S.W.3d 533, 535 (Tenn. 2015). In *In re Kaliyah S.*, the Tennessee Supreme Court held that the Tennessee statute governing termination of parental rights does not require proof of reasonable efforts as a precondition to termination. *Id.* at

554; *see* Tenn. Code Ann. § 36-1-113. As the court explained, "nothing in the plain language of Section 36-1-113 indicates that a petitioner in a proceeding to terminate parental rights is in fact required to put on proof of DCS's reasonable efforts to assist the respondent parent." *In re Kaliyah S.*, 455 S.W.3d at 554. Rather, "Tennessee's Legislature chose to make reasonable efforts one of the enumerated factors for the trial court to weigh in determining the child's best interest." *Id.* at 555. The court held that proof of reasonable efforts should only be considered, but should not necessarily be dispositive, with regard to abandonment by failure to establish a suitable home and the best interests of the child. *Id.* at 554 n.29, 555. In light of the Tennessee Supreme Court's opinion in *In re Kaliyah S.*, we conclude that this argument is without merit.

Next, Father argues that the trial court erred in relying on his substantial noncompliance as a ground for termination because DCS failed to demonstrate that his noncompliance was "willful." In pertinent part, Tennessee Code Annotated section 36-1-113(g)(2) provides that parental rights may be terminated when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan[.]" While there is nothing in the statute to indicate that the parent's noncompliance must be "willful," we note that, as we stated above, the permanency requirements must be reasonable. In our view, Father's "willfulness" argument is more aptly characterized as a challenge to the reasonableness of the permanency requirements. For example, Father contends that he was unable to comply with some of the permanency requirements due to his status as a Mexican citizen living without legal status in the United States. Specifically, he submits that he is not legally able to get a driver's license, register a vehicle, get automobile insurance, or get a regular job with regular wages. While we agree that it would be unreasonable to impose permanency requirements that are impossible for an individual to perform based on his or her legal status, that is not the case here. The permanency plans in this case did not require Father to get a driver's license, register a vehicle, or get automobile insurance. Rather, they required Father to develop and submit a transportation plan to DCS. Father's ability to comply with that requirement was in no way affected by his legal status. While Father testified that he developed a transportation plan, it appears from the record that he only provided Ms. Raulston with the name of an individual who was willing to transport the children when he was working. Father did not know the last name of the individual and testified that, at the time he provided her name to Ms. Raulston, she did not have a driver's license. Understandably, Ms. Raulston did not accept this as a viable plan for transporting the children.

While the permanency plans did require Father to provide DCS with proof of legal and verifiable income, we are not willing to hold that such a requirement was unreasonable even in light of Father's legal status. The purpose of this requirement was to establish Father's financial ability to care for the children. Given the State's duty to protect minor children, requiring a parent whose child has been removed from their care to submit proof of their financial stability is clearly reasonable.

In any event, even if we were to hold otherwise, the trial court's reliance on substantial noncompliance as grounds for termination in this case would be justified by Father's failure to complete numerous other permanency requirements. By his own admission, Father failed to complete a psychological evaluation, parenting assessment, nutrition class, or domestic violence class, submit childcare, discipline, or meal plans, or make an effort to communicate with the children more effectively in English or Spanish. Father does not assert that his legal status prevented him from completing those requirements in any way. We are therefore satisfied that there is clear and convincing evidence to support the trial court's finding of substantial noncompliance.

### *Abandonment by Willful Failure to Visit*

The second statutory ground relied on by the trial court to terminate Father's parental rights was abandonment by willful failure to visit. *See* Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102(1)(A)(i) provides that abandonment may be established by showing that:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

"Willfully failed to visit" is further defined as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Additionally, "token visitation" is visitation that, "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

The petition to terminate Father's parental rights to J.L., A.L., and M.L. was filed August 28, 2015. Accordingly, the focus of our inquiry is Father's contact with the children during the four-month period immediately preceding the filing of the petition. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014). The record reflects that Father attended visitation with the children on two occasions during that period. Additionally, it demonstrates that Father called the children occasionally during the time they were in foster care. Although the dates of the calls are not specified in the record, we will assume that at least some of the calls occurred during the relevant four-month period. The issue, then, is whether Father's contacts with the children in

the four months preceding DCS's filing of the termination petition constituted token visitation and, if so, whether his failure to engage in more than token visitation was willful.

The trial court explained its reasoning for finding that Father engaged in only token visitation during the four-month period:

As to the second ground alleged, namely abandonment for failure to visit or to have only token visitation for the 4 months preceding the filing of the Petition for Termination, the proof was that [Father] cancelled the April visit, had no visit in May, left early at the June 25th visit, had no visit in July and left 1 hour early on the August 20, 2015 visit. The Court finds 2 visits of 2 hours each[5] out of 8 possible visits for 16 hours to be token visitation and ground for termination of his parental rights for abandonment[.]

We agree with the trial court that Father's limited contact with the children during the four-month period immediately preceding DCS's filing of the termination petition meets the statutory definition of token visitation. Although Ms. Raulston arranged for him to have in-person visits with the children every two weeks for two hours each, Father only attended two visits in the relevant time period preceding the termination petition and left each after only an hour. A.L. and M.L.'s foster mother, Veronica R., testified that the children were happy to see Father during the visits but were usually much more excited to see their siblings. She testified that the children mostly played with each other and did not appear to have a strong bond with Father. Similarly, J.L.'s foster mother, Naomi M., testified that the children mostly played with each other and did not spontaneously exhibit any affection for Father during the visits. Ms. Raulston also testified that Father had limited interaction with the children during the visits after they greeted him initially. Father also communicated with the children over the phone. Naomi M. testified that Father normally called the children every two to three weeks, although the frequency of his calls increased whenever a court date was approaching. While it is unclear how many calls took place in the relevant time period, the record reflects that the language barrier between Father and the children made meaningful communication difficult over the phone. Ms. Raulston explained that Father spoke Spanish during the calls and the children, whose ability to understand Spanish is limited, would pass the phone around or hand it back their foster parents. In our view, these contacts were not sufficiently geared toward establishing a healthy parental relationship so as to constitute more than token visitation.

Finally, we must determine whether Father's failure to engage in more than token visitation was willful. Willfulness in this context does not require the same level of culpability required by the penal code, nor does it require that the parent act with malice or ill

---

[5] Based on the testimony in the record and the trial court's findings, it does not appear that Father actually stayed for the full two hours during either of those visits.

- 10 -

will. *In re Audrey S.*, 182 S.W.3d at 863. Rather, failure to visit a child is considered willful when the parent is aware of his or her duty to visit, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *Id.* at 864. In his appellate brief, Father argues that his failure to visit was not willful. Father testified in order to attend visits, he had to take time off from work and pay a friend to take him. He also testified that he only left the visits early because the individual who gave him a ride would complain and demand to leave. We note, however, the trial court's finding that Father was not a credible witness and that his testimony was contradicted by Ms. Raulston, who testified that she "always offered to help him with transportation." Ms. Raulston testified that she took Father to several visits and that he never mentioned paying a friend to take him on other occasions. In any event, regardless of any logistical difficulties Father faced, the record reflects that he did not take full advantage of the limited time he did spend with the children during the visits. Veronica R., Naomi M., and Ms. Raulston each testified that Father had limited interaction with the children during the visits and spent the majority of the visits on his phone. While Father testified that he only used his phone during the visits to take pictures of the children, that does not change the fact that he did not use the time to develop his relationship with them. Father acknowledged that the criteria and procedures for termination of parental rights were thoroughly explained to him in Spanish. He was aware of his duty to engage in more than token visitation with the children, he had the capacity to do so, and he did not attempt to do so. In light of the foregoing, we are therefore satisfied that the trial court's finding of abandonment for failure to visit is supported by clear and convincing evidence.

## BEST INTERESTS

Once at least one of the statutory grounds for termination of parental rights has been established by clear and convincing evidence, the petitioner must prove by clear and convincing evidence that termination of the parent's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(2); *In re Angela E.*, 303 S.W.3d at 251. After the court has determined that the parent is unfit based on clear and convincing evidence that one or more of the grounds for termination exists, the interests of the parent and child diverge, and the interests of the child become the court's paramount consideration. *In re Audrey S.*, 182 S.W.3d at 877. Nevertheless, because not all parental misconduct is irredeemable, the statutes governing termination of parental rights in Tennessee recognize that terminating the parental rights of an unfit parent will not always serve the best interests of the child. *Id.*

The General Assembly has provided a list of factors that trial courts should consider in determining the best interests of the child in a parental termination case at Tennessee Code Annotated section 36-1-113(i). Although courts should consider the statutory factors to the extent that they are relevant to the particular facts and circumstances of the case, the list is "not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the

- 11 -

best interest of a child." *In re M.A.R.*, 183 S.W.3d at 667. Depending on the circumstances of the case, the consideration of a single factor, or of facts outside the statutory factors, may dictate the outcome of the court's analysis. *In re Audrey S.*, 182 S.W.3d at 878.

In its order terminating Father's parental rights, the trial court made the following findings concerning the children's best interests:

> As previously noted, the Court would consider leniency based on [Father's] illegal alien status, but the Court does not find [Father] to be credible. It appears to the Court that [Father] still has involvement with [Mother], even though he knows what she did to [A.L.]. The Court watched [Father] carefully when he was shown the Facebook pages in collective Exhibit 6, and listened when he said his contact with her was a "mistake," that he was done with her. He could have unfriended her and contacted the police. All this has occurred since she was indicted and arrested in his apartment[.]

> Additionally, [Father] knew about [Mother's] abuse of her older child, [A.R.], and was with her during that time, yet he continued to allow his children to stay with her.

> [Father's] relationship with his children is not meaningful. He has not maintained consistent visitation with them and the children have to be prompted to hug their father.

> The children are doing well in their respective foster homes and they have a continuing relationship with their other siblings. The foster parents wish to adopt and any change in caretakers would be detrimental to their emotional and mental health.

> Based on the above facts the Court finds by clear and convincing proof that it is in the children's best interest for [Father's] parental rights to be terminated.

The evidence in the record supports the trial court's findings. Although Father testified that he was in Florida when Mother began abusing A.R., he admitted that he was aware of the abuse after A.R. was removed from Mother's care in 2012. He nevertheless allowed J.L., A.L., and M.L. to remain in her care until they were removed by DCS in March 2014 under similar circumstances. When asked why, despite knowing that Mother had severely abused one of her children, he believed she would not abuse his children, Father testified that he "never thought about that." At best, Father's decision to leave his children in Mother's care after learning that she severely abused A.R. casts serious doubt on his capacity to provide for the safety and stability of the children; at worst, it demonstrates an egregious

- 12 -

indifference towards their well-being. While Father's testimony persuades us that the former is the more likely explanation, the fact remains that Father has not demonstrated an ability to make sound parenting decisions in the past.

Additionally, the record reflects that Father has had very little involvement in the children's lives to this point. Prior to their removal from Mother's care, Father spent approximately six months out of the year living in Florida. Although Father visited and cared for the children at times when he was in Tennessee, he has never lived with them on a long-term basis. When asked at trial when he last saw the children before their removal from Mother's care, Father responded that he could not remember.

The children have been living in foster homes since March 2014 and have shown remarkable improvement in that time. A.L. and M.L. were placed in foster care with A.R.'s adoptive parents, Veronica R. and her husband. Veronica R. testified that A.L. was severely malnourished and extremely shy when he first came into their custody. She testified that he had improved physically with the help of physical therapy and explained that, although he was still shy around strangers, he had overcome his shyness to the point that he "talks all the time" around their family. She testified that he was very intelligent and enjoyed taking time to help M.L. learn to read and write. She testified that M.L. had also overcome her shyness and was advancing faster than normal because of A.L.'s help. She testified that A.L. and M.L. referred to her and her husband as "Mom" and "Dad," and she expressed that they were interested in adopting the children if Father's parental rights were terminated. J.L. and C.B. were placed in foster care together with Naomi M. Naomi M. testified that J.L. was also extremely shy at first but had become much more talkative since coming into her home. She testified that he was doing well in kindergarten and was particularly good at math. She testified that she was willing to adopt J.L. and C.B. if Father's parental rights were terminated and that she hoped to continue her close friendship with Veronica R. so that J.L. and C.B. can maintain close relationships with A.L., M.L., and A.R. Having carefully reviewed the record, we conclude that clear and convincing evidence supports the trial court's conclusion that terminating Father's parental rights is in his children's best interest.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court. Costs of this appeal are assessed against the Appellant, Jose C.L.R. Because Jose C.L.R. is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

                                           _____

                                           ARNOLD B. GOLDIN, JUDGE